## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 09-37555-hdh-11** |
| | § | |
| **TEXAS BAY PLANTATION HOUSE** | § | |
| **LIMITED PARTNERSHIP,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

### DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF
### DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION
DATED: February 17, 2010

**THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND DESCRIBES THE TERMS AND PROVISIONS OF, AND SETS FORTH CERTAIN MATERIAL CONSIDERATIONS IN CONNECTION WITH, THE DEBTOR'S PLAN OF REORGANIZATION, AS AMENDED (THE "PLAN"). ANY CAPITALIZED TERM USED IN THIS DISCLOSURE STATEMENT THAT IS NOT DEFINED HEREIN HAS THE MEANING ASCRIBED TO THAT TERM IN THE PLAN. THE DEBTOR URGES YOU TO ACCEPT THE PLAN BY SIGNING AND RETURNING THE BALLOTS MAILED TO YOU ALONG WITH THIS DISCLOSURE STATEMENT. IN THE EVENT THAT THE PLAN IS NOT CONFIRMED, THE DEBTOR LIKELY WILL BE FORCED TO LIQUIDATE ITS ASSETS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. IN A CHAPTER 7 LIQUIDATION, THE DEBTOR BELIEVES THAT UNSECURED CREDITORS WOULD RECEIVE NO DISTRIBUTIONS OR ELSE SUBSTANTIALLY LESS THAN IS CONTEMPLATED BY THE PLAN.**

Jeff Carruth
Texas State Bar No.  24001846

REED & ELMQUIST, P.C.
604 Water Street
Waxahachie, TX 75165
(469) 483-0218
(972) 923-0430 (fax)
*jcarruth@bcylawyers.com*


COUNSEL FOR THE DEBTOR AND
DEBTOR IN POSSESSION

## NOTICE

ON _____, 2010, AFTER NOTICE AND A HEARING, THE COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT DETAIL ADEQUATE TO ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF THE CLASSES OF CLAIM HOLDERS AND INTEREST HOLDERS ENTITLED TO VOTE PURSUANT TO THE PLAN TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN, NOR DOES IT CONSTITUTE AN ENDORSEMENT OF THE PLAN.

The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committees have been appointed in the Bankruptcy Case.

The Debtor has proposed a Plan of Reorganization, dated February 17, 2010, as may be amended, (the "Plan") for the benefit of the creditors of the Debtor.

All holders of Claims or Interests are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, which is annexed hereto and enclosed herewith. Voting instructions regarding the Plan are provided (i) in this Disclosure Statement, (ii) in the Order approving the Disclosure Statement, and (iii) in the Ballots enclosed herewith. The Plan can only be confirmed if at least one voting Class of Claims votes in favor of the Plan.

If the Plan is confirmed, the Claims of holders of Allowed Claims against the Debtor will be entitled to distributions and treatment as set forth in the Plan. Due to the substantial secured claims asserted against the Debtor, there may be far fewer funds remaining for distribution to holders of General Unsecured Claims if the Plan is not confirmed and the Debtor is forced to liquidate in Chapter 7. A more detailed overview of the Plan is set forth in Article VII below.

Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to such terms in the Glossary attached hereto as Annex 1 and incorporated by reference herein.

## I. INTRODUCTION

### A. Purpose of the Disclosure Statement.

This Disclosure Statement is submitted by the Debtor pursuant to section 1125 of the Bankruptcy Code in connection with the Debtor's Plan. A copy of the Plan is enclosed with this Disclosure Statement. For purposes hereof, any term used in this Disclosure Statement (regardless of capitalization) and not otherwise separately defined herein or in the Glossary (Annex 1 to the Plan) shall have the defined meaning ascribed to it in the Plan or, if not defined in the Plan, then in section 101 of the Bankruptcy Code. As used herein, "Reorganized Debtor" means the Debtor, on and after the Effective Date of Confirmation of the Plan.

On _____, 2010 after notice and a hearing, the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the Classes of Claim holders and Interest holders entitled to vote pursuant to the Plan to make an informed judgment on whether to accept or reject the Plan. The Court's approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Disclosure Statement or the Plan, nor does it constitute an endorsement of the Plan. Approval does indicate, however, that the Court has determined that the Disclosure Statement meets the requirements of section 1125 of the Bankruptcy Code and contains adequate information to permit the holders of Allowed Claims, whose acceptance of the Plan is solicited, to make an informed judgment regarding acceptance or rejection of the Plan.

IT IS OF UTMOST IMPORTANCE THAT YOU READ THIS DISCLOSURE STATEMENT IN FULL AND IN CONJUNCTION WITH THE PLAN AND GLOSSARY ATTACHED HERETO.

OTHER THAN THIS DISCLOSURE STATEMENT, NO STATEMENT OR INFORMATION GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN HAS BEEN APPROVED BY THE BANKRUPTCY COURT CONCERNING (1) THE DEBTOR AND ITS OPERATIONS, ASSETS OR PROPERTY; (2) THE REORGANIZED DEBTOR AND THE PROJECTED RESULTS OF ITS FUTURE OPERATIONS AND FINANCIAL CONDITION; OR (3) DISTRIBUTIONS TO BE MADE UNDER THE PLAN.  YOU SHOULD USE CAUTION IN CONSIDERING ANY STATEMENT OR INFORMATION IN MAKING YOUR VOTING DECISION BASED UPON INFORMATION NOT CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTOR AND THE REORGANIZED DEBTOR AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. *SEE* "ARTICLE IX – FEASIBILITY AND RISKS." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.

**B.  Hearing on Confirmation of the Plan.**

The Court has set the Confirmation Hearing for _____, 2010 at _____, m., Central Time, in the courtroom of the Honorable Harlin D. Hale, United States Bankruptcy Judge for the Northern District of Texas, Dallas Division, located at 14th Floor, Courtroom #3, 1100 Commerce St., Dallas, Texas 75242.  The Confirmation Hearing may be adjourned and/or continued by the Court from time to time without further notice other than an announcement made in open court at the Confirmation Hearing or any continued hearing thereon.

**C.  Sources of Information.**

THE STATEMENTS AND THE FINANCIAL INFORMATION ABOUT THE DEBTOR AND/OR THE REORGANIZED DEBTOR INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS AND INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM THE DEBTOR'S BOOKS AND RECORDS.  WHILE THE DEBTOR BELIEVES THE INFORMATION TO BE ACCURATE AND COMPLETE, THE DEBTOR AND ITS PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIM ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT OR SINCE THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents.  While the Debtor has made every effort to retain the

meaning of such other documents or portions that have been summarized, the Debtor urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall apply and govern.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the holder of a Claim or Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements made by or on behalf of any party other than the Debtor should be reported to counsel for the Debtor.

## II. OVERVIEW OF CHAPTER 11

### A. <u>Overview of Chapter 11.</u>

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code. Upon the commencement of a Chapter 11 case, section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect upon claims against a debtor that arose prior to the bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Under Chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor and its creditors. Confirmation of a plan of reorganization is the primary purpose of a reorganization case under Chapter 11 of the Bankruptcy Code.

### B. <u>Plan of Reorganization.</u>

A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Generally, a claim against a debtor arises from a normal debtor/creditor transaction such as a promissory note or a trade-credit relationship, but may also arise from other contractual arrangements or from alleged torts. An interest in the debtor is held by a party that owns all or part of the debtor, such as a shareholder or partner.

After a plan of reorganization has been filed with a bankruptcy court, it must be accepted by holders of impaired claims against, or interests in, the debtor. Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose sufficient information about the debtor, its assets, and the plan of reorganization to claim holders and interest holders before acceptances of that plan may be solicited. This Disclosure Statement is being provided to the holders of Claims against, or Interests in, the Debtor to satisfy such requirements of section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that claim holders and interest holders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class. While courts have disagreed on the proper method to be used in classifying claim holders and interest holders, a general rule of thumb is that claim holders with similar legal rights are placed together in the same class and that interest holders with similar legal rights are placed together in the same class. For example, all claim holders entitled to priority under the Bankruptcy Code might be placed in one class, while all claim holders holding subordinated unsecured claims might be placed in a separate class. Generally, each secured creditor will be placed in a class by itself because each such creditor usually has a lien on distinct property and therefore has distinct legal rights.

The Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan for the Court to confirm the Plan. Rather, the Plan must be accepted by each *Class* of holders of Claims or Interests (subject to an exception discussed below and in Article III.C.4.). A Class of holders of Claims or Interests accepts the Plan if, of the Claims in the Class that actually voted on the Plan, such Claims constituting at least two-thirds in dollar amount and more than one-half in number of voted Allowed Claims are voted in favor of the Plan.

The Court may confirm the Plan even though fewer than all Classes of Claims and Interests vote to accept the Plan. In this instance, the Plan must be accepted by at least one "impaired" Class of Claims, without including any acceptance of the Plan by an Insider. Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a claim is "impaired" if the legal, equitable, or contractual rights of such claim are altered under a plan.

If all impaired Classes of Claims and Interests under the Plan do not vote to accept the Plan, the Debtor is entitled to request that the Court confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. These "cramdown" provisions permit the Plan to be confirmed over the dissenting votes of Classes of Claims and/or Interests if at least one impaired Class of Claims votes to accept the Plan and the Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting Class of Claims and Interests.

Independent of the acceptance of the Plan as described above, to confirm the Plan the Court must determine that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See below, "Voting Procedures and Requirements for Confirmation," Article III, for a discussion of the section 1129(a) requirements for confirmation of a plan of reorganization. **THE DEBTOR BELIEVES THAT THE PLAN SATISFIES EACH OF THE CONFIRMATION REQUIREMENTS OF SECTION 1129(a) AND, IF NECESSARY, SECTION 1129(b) OF THE BANKRUPTCY CODE.**

Confirmation of the Plan makes the Plan binding upon the Debtor, the Reorganized Debtor, Claim holders, Interest holders, and other parties in interest irrespective of whether they have filed proofs of Claim or voted to accept the Plan.

## III. VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION

If you are the holder of a Claim or Interest in one of the Classes whose rights are affected by the Plan, it is important that you vote. If you fail to vote, your rights may be jeopardized.

### A. Persons Entitled to Vote.

Pursuant to the provisions of section 1126 of the Bankruptcy Code, only holders of Claims or Interests that are (i) Allowed, (ii) impaired, and (iii) receiving or retaining property on account of such Claims pursuant to the Plan, are entitled to vote either for or against the Plan ("Voting Claims"). Accordingly, in this Bankruptcy Case, all Classes of Claims are impaired under the Plan, may have a Voting Claim, and should have received a Ballot for voting (with return envelope) along with this Disclosure Statement, Plan, and other materials because these are the only Classes consisting of impaired Claims that are receiving property. Under the Bankruptcy Code, Classes that are unimpaired are presumed to vote to accept the Plan and, therefore, votes from such Classes are not solicited.

As referenced in the preceding paragraph, a Claim must be Allowed to be a Voting Claim. The Debtor filed the Schedules in its Bankruptcy Case listing Claims against the Debtor. To the extent a creditor's Claim was listed in the Debtor's Schedules, and was not listed as disputed, contingent, or unliquidated, such Claim is deemed "Allowed." Any creditor whose Claim was not scheduled, or was listed as disputed, contingent, or unliquidated, must have timely filed a proof of Claim in the Debtor's case in order to have an Allowed Claim against such Debtor.

The last day for holders of Claims to have filed their Claims for amounts owed or Interests held prepetition against the Debtor was March 2, 2010. This date constituted the "Claims Bar Dates" for Claims against or Interests in the Debtor. Claims not filed by the Claims Bar Date are forever barred and discharged.

**Absent an objection to a timely filed proof of Claim by the Objection Deadline, such Claim is deemed Allowed. In the event that any proof of Claim is a Contested Claim during the Plan voting period, then, by definition, it is not Allowed for purposes of section 1126 of the Bankruptcy Code, and is not to be considered a Voting Claim entitled to cast a Ballot. Nevertheless, pursuant to Bankruptcy Rule 3018(a), the holder of a Contested Claim may petition the Bankruptcy Court, after notice and hearing, to allow the Claim temporarily for voting purposes in an amount that the Bankruptcy Court deems proper. Allowance of a**

Claim for voting purposes, and disallowance for voting purposes, does not necessarily mean that all or a portion of the Claim will be Allowed or Disallowed for distribution purposes.

**BY ENCLOSING A BALLOT, THE DEBTOR IS NOT REPRESENTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN. BY INCLUDING A CLAIM AMOUNT ON THE BALLOT (IF APPLICABLE), THE DEBTOR IS NEITHER ACKNOWLEDGING THAT YOU HAVE AN ALLOWED CLAIM IN THAT AMOUNT NOR WAIVING ANY RIGHTS THE DEBTOR MAY HAVE TO OBJECT TO YOUR VOTE OR CLAIM.**

**THE PLAN, AS DESCRIBED HEREIN, PROVIDES FOR THE FULL PAYMENT OF ALL ALLOWED CLAIMS, INCLUDING GENERAL UNSECURED CLAIMS (WITH THE EXCEPTION OF CERTAIN CLASS 6 SUBORDINATED CLAIMS WHICH SHALL CONSENT TO SUBORDINATION UNDER THE PLAN). ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS TO VOTE FOR THE PLAN.**

If you believe you are a holder of a Claim in an impaired Class under the Plan and entitled to vote to accept or reject the Plan, but did not receive a Ballot with these materials, please contact Jeff Carruth, Reed & Elmquist, P.C., 604 Water Street, Waxahachie, Texas 75165, telephone (469) 483-0218, fax (972) 923-0430, email: *jcarruth@bcylawyers.com.*

**B. Voting Instructions.**

If you are a holder of a Voting Claim, your vote on the Plan is important. Please read the voting instructions carefully and return your Ballot as specified below and on the Voting Instructions contained in and attached to your Ballot.

**1. Deadline for Submission of Ballots**

BALLOTS MUST BE ACTUALLY RECEIVED BY THE DEBTOR'S COUNSEL, WHETHER BY MAIL, COURIER, FACSIMILE, OR ELECTRONIC MAIL, ON OR BEFORE _____, 2010 AT 5:00 **P.M. CENTRAL TIME**. ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT THAT IS NOT EXECUTED BY A PERSON AUTHORIZED TO SIGN SUCH BALLOT WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN OR YOU DID NOT RECEIVE OR NEED A REPLACEMENT BALLOT, CONTACT JEFF CARRUTH, REED & ELMQUIST, P.C., 604 WATER STREET, WAXAHACHIE, TX 75165, (469) 483-0218, FAX (972) 923-0430, EMAIL: JCARRUTH@BCYLAWYERS.COM. **THE DEBTOR URGES ALL HOLDERS OF VOTING CLAIMS TO VOTE IN FAVOR OF THE PLAN.**

**2. Incomplete or Irregular Ballots**

Ballots that fail to designate the Class to which they apply will be counted, subject only to contrary determinations by the Court, in the Class determined by the Debtor. The Debtor's counsel will use its best judgment in the determination of votes; however, Ballots that do not reflect acceptance or rejection, or reflect both acceptance and rejection of the Plan for a single Claim, may not be counted.

**3. Ballot Retention**

Original ballots will be retained by the Debtor's counsel for six months following the Confirmation Date, after which they may be destroyed at the discretion of the Debtor's counsel.

### C. Confirmation of Plan.

#### 1. Solicitation of Acceptances

The Debtor is soliciting your vote. The cost of any solicitation by the Debtor will be borne by the Debtor. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE THAT ARE OTHER THAN HEREIN CONTAINED SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

**THIS IS A SOLICITATION SOLELY BY THE DEBTOR AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY, FINANCIAL ADVISOR, OR ACCOUNTANT FOR THE DEBTOR. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS, FINANCIAL ADVISORS, OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

Under the Bankruptcy Code, a vote for acceptance or rejection of the Plan may not be solicited unless the Claim holder has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code. Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

#### 2. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. If those requirements have been satisfied, the Court will enter the Confirmation Order. The requirements for confirmation under the Bankruptcy Code are as follows:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.
2. The proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code.
3. The Plan has been proposed in good faith and not by any means forbidden by law.
4. Any payment made or promised by the proponent of the Plan or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the Plan and incident to the Bankruptcy Case, was disclosed to the Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable.
5. The proponent of the Plan has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as director, officer, or voting trustee of the Debtor, any affiliate of the Debtor participating in a plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or the continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy.
6. The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtor and the nature of the compensation for such Insider.
7. Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.
8. With respect to each Class of impaired Claims, either each holder of a Claim in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a

value, as of the Effective Date of the Plan, that is not less than the amount such Claim holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code.

9. Subject to the Plan proponent's "cramdown" right described in Article III.C.4., which follows, each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

10. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims will be paid in Cash in full on the Effective Date and that any tax Claim entitled to priority under section 507(a)(8), the holder of such Claim will receive on account of such Claim regular installment payments, (i) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; (ii) over a period ending not later than 5 years after the date of the order for relief; and (iii) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

11. At least one impaired Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in such Class.

12. Confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

13. All fees payable under 28 U.S.C. § 1930 have been paid (or the Plan has provided for payment of such fees) on the Effective Date of the Plan.

14. The Plan provides for continuation after its Effective Date of retiree benefits, if any, for the duration of the period the Debtor has obligated itself to provide such benefits.

The Debtor believes that the confirmation requirements applicable to the Bankruptcy Case are met under the Plan. The Debtor will present evidence in support of each applicable requirement at the Confirmation Hearing.

### 3. Acceptances Necessary to Confirm the Plan

The Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan for the Court to confirm the Plan. Rather, the Plan must be accepted by each *Class* of holders of Claims or Interests (subject to an exception discussed below and in Article III.C.4.). Under the Bankruptcy Code, a Class of holders of Claims or Interests has accepted the Plan if, of the Claims in the Class that actually are voted on the Plan, such Claims constituting at least two-thirds in dollar amount and more than one-half in number of voted Allowed Claims vote to accept the Plan, excluding the votes of Insiders. For example, if a hypothetical class has ten claims that are voted and the total dollar amount of those ten claims is $1,000,000, then for such class to have accepted the plan, six or more of those claims must be voted to accept the plan (a simple majority), and the claims voted to accept the plan must total at least $666,667 (a two-thirds majority).

### 4. Cramdown

If any impaired Class of Claims does not vote to accept the Plan, the Court may nevertheless confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. If the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" to each Class of dissenting holders of Claims or Interests, the Court may confirm the Plan through "cramdown." The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive.

With respect to each dissenting Class of unsecured Claims, "fair and equitable" means either: (i) the members of each dissenting impaired Class of unsecured Claims receive property of a value, as of the Effective Date of the Plan, equal to the amount of their Allowed Claim; or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of unsecured Claims will not receive any property under the Plan. The Plan is not fair and equitable to a Class of holders of Interests if any Class of holders of Claims is paid more than in full.

### 5. Absolute Priority Rule

Simply characterized, the absolute priority rule set forth in section 1129(b)(2)(B) of the Bankruptcy Code requires that confirmation obtained by "cramdown" meet an "either/or" test. Either (i) the members of each

dissenting impaired Class of unsecured Claims must be paid in full, or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of Claims must not receive any property under the plan of reorganization on account of "such junior interest." The absolute priority rule applies only in cases where a Class of Claims or equity Interests is impaired and does not accept the Plan. Thus, the absolute priority rule does not apply to all Classes of Claims and equity Interests but only to the dissenting Class and Classes junior to the dissenting Class.

The Debtor anticipates that each Class will accept the Plan such that the absolute priority rule will not come into play at the Confirmation Hearing. Furthermore, each Class of Claims is paid in full under the Plan, and hence the prepetition holders of Interests in the Debtor shall retain such Interests and hold such Interests with respect to the Reorganized Debtor.

A more comprehensive discussion of the application of the absolute priority rule and the new value exception contains complexities and subtleties, the explanation of which is beyond the scope of this Disclosure Statement. To the extent a Claim holder or Interest holder desires further explanation regarding such rule or its exception, such holder is advised to seek advice of counsel.

## IV.  BACKGROUND OF DEBTOR AND EVENTS LEADING TO BANKRUPTCY

### A.  Relevant and Recent History of the Debtor.

#### 1.  Overview of the Plantation House Apartment Complex

This is a single-asset real estate case. The real estate at issue is the Plantation House apartment complex located at 2625 Hudnall Street, Dallas, Dallas County, Texas (the "Property"). The Property is a Class C property that consists of a 124-unit multifamily residential community completed in 1961. When built the property had 125 units; however, one unit (B2) was converted to the leasing/management office. The unit mix contains 7% efficiency units, 46% one-bedroom/one-bath units, 16% two bedroom/one-bath plans and 31% two-bedroom/two bath units. The net rentable area totals 110,988 square feet with an average unit size of 895 square feet.

The Property is situated along the southern edge of a city block that is roughly triangular in shape. Hudnall Street runs roughly east-west and forms the southern boundary of the block and is the street toward which the Property faces. Denton Drive runs roughly north-south and lies along the eastern boundary of the Property. Denton Drive Cut Off runs from southwest to northeast and forms the hypotenuse of the triangle. Maple Ave. runs immediately to the west of the block. A diagram of the area surrounding the Property from the Dallas Central Appraisal District and showing the location of the Property is set forth below.



Plantation House

The Property is situated approximately 125 yards from a elevated station — specifically, the Inwood Station — under construction along the DART Green Line light rail line. The DART Green Line and the Inwood Station are scheduled to open in December, 2010. The DART Green Line will make the Property directly accessible by rail to downtown Dallas and the Dallas Love Field Airport, among other significant destinations. The Property also is situated near the Parkland and U.T. Southwestern medical complexes and these medical facilities are expected to experience tremendous growth in the next five (5) years.

### 2. The Debtor's credit facilities with respect to the Property.

The Debtor purchased the Property in January, 2003 for the price of $4.32 million. The Debtor financed the purchase of the Property through lending provided by Coastal Banc, SSB, and Coastal Banc, SSB, in turn obtained a deed of trust, first lien position with respect to the Property along with other rights and interests set forth in the relevant loan and security documents. In June, 2005, the Debtor refinanced the existing indebtedness with Coastal Banc, SSB through a credit facility in the amount of $3.8 million (the "Loan") provided by Washington Mutual Bank, N.A. ("Washington Mutual"). Accordingly, the Debtor granted Washington Mutual a first lien position with respect to the Property along with other rights and interests set forth in the relevant loan and security documents (the "Secured Lender's Interests"). The Loan included a variable interest rate initially set at the rate of 4.883% per annum, and a maturity date of July 1, 2010. JP Morgan Chase Bank, N.A. ("Chase") acquired Washington Mutual in 2009.

On September 28, 2009, Chase sold the Loan and the Secured Lender's Interests to Homer J. Rader, Jr. Elizabeth J. Rader, Homer John Rader, III, and William Scott Rader (collectively, the "Raders") for the purchase price of $3.5 million. Also on September 28, 2009, the Raders assigned the Loan and the Secured Lender's Interests

to RP Dentwood, SC, L.P. ("Dentwood"), an entity controlled by members of the Rader family. According to Dentwood, Dentwood remains the owner and holder of the Loan and the Secured Lender's Interest.

In addition to acquiring the Loan, the Raders also have acquired the remainder of the city block on which the Property sits. A diagram indicating the real estate holdings of the Raders immediately contiguous to the Property is attached hereto as **Exhibit A** and incorporated by reference herein. The Debtor is of the belief that the Property is crucial for the Raders' overall intentions for the block on which the Property is situated.

### B. Management's Discussion of the Events Leading to Bankruptcy.

The Debtor became delinquent in the payment of the principal and interest required under the Loan during June, 2009. The Property was no longer able to service the Loan according to its stated terms due to the overall economic climate in the Dallas-Fort Worth area during early 2009, and the Property suffered a decline in overall occupancy and the collection of rent.[1]

The Debtor earlier in 2009 anticipated the short fall in revenue and interruption in servicing the Loan and undertook (*i*) negotiations with Chase to address the interruption on normal service of the Loan and (*ii*) efforts to market the Property to potential investors in order to take advantage of the enormous potential value and development potential of the Property given its proximity to the DART Green Line and the Property's potential for transit oriented development. The Debtor's efforts with Chase did not conclude prior to Chase's sale of the Loan to the Raders and subsequent assignment to Dentwood. Dentwood posted the Property for a substitute trustee's foreclose sale for November 2, 2009. Dentwood and the Raders did not give the Debtor proper notice of their purchase of the note or of the foreclosure sale and refused to postpone the foreclosure in an attempt to improperly obtain ownership of the Property.

It bears noting that the Debtor engaged in negotiations with the Raders for the sale and purchase of the Property prior to the time when the Debtor learned of the Raders' and/or Dentwood's acquisition of the Loan. On information and belief, representatives of the Raders and/or Dentwood without the authorization of the Debtor also obtained confidential information from a real estate broker-advisor previously utilized by the Debtor. Furthermore, subsequent to Dentwood's acquisition of the Loan, Dentwood's representatives obtained in an unauthorized and/or illicit manner information from employees of Legend Asset Management II, LLC ("Legend"), the property management firm hired by the Debtor to operate the Property, and made one or more unauthorized entries onto the Property. The Debtor continues to investigate the activities of the Raders and Dentwood in these regards, and the Debtor continues to evaluate whether the conduct of the Raders and Dentwood is actionable and the extent to which the Debtor (and/or the bankruptcy estate) has suffered damages by such conduct. For purposes of this Disclosure Statement and the Plan, the Debtor's potential claims and causes of action against the Raders and Dentwood are among the "Estate Actions" of the Debtor (or Reorganized Debtor, as applicable).

### C. Goal of the Debtor's Bankruptcy Case.

The Debtor's Bankruptcy Case is intended to assist the Debtor in, among other things: (i) restructuring the Debtor's debts and, primarily, the substantial liability to Dentwood; (ii) reorganizing the Debtor's obligations to enable the Property to maintain a high occupancy rate and long term to take advantage of the infrastructure and demographic changes occurring around the Property; and (iii) attempting to market the Property in order to maximize the potential value of the Property through a sale. According to a January 7, 2010 appraisal of the Property, the minimum market value of the Property is $4,825,000.00 (the "McRoberts Appraisal"). A summary of the appraisal conducted by Andrew J. McRoberts, MAI, CRE and McRoberts & Company, Inc. (collectively "McRoberts") is attached hereto as **Exhibit B** and incorporated by reference herein.

The proposed Plan is the Debtor's best prospect for a prompt, objective, and streamlined approach to reorganization and generating the revenue necessary to continue operations and pay creditors' Allowed Claims. The McRoberts appraisal concludes that the market value of the Property is driven by its close proximity to the DART

---

[1]  The occupancy rate of the Property has recovered and has remained above 90% during December, 2009 and January, 2010.

Green Line and the redevelopment potential of the Property as a high-density multifamily residential complex or other high value transit oriented development. Prior to the Chapter 11 case, the Debtor received offers for the Property for as much as $6 million. The Debtor believes that when properly marketed, and given an appropriate passage of time after the emergence from Chapter 11, that the Property could sell for as much as $6 million or perhaps even more.

## V. POST-PETITION OPERATIONS AND SIGNIFICANT ORDERS AND EVENTS

### A. Post-Petition Operations.

The Debtor has filed its schedules and statements of financial affairs with the Court (including all amendments and supplements thereto, the "Schedules"). The Schedules contain a detailed description of the Debtor's assets, liabilities, and other information related to its operations. Copies of the Debtor's Schedules and other filings may be obtained online from the Court's website at: https://ecf.txnb.uscourts.gov/cgi-bin/login.pl. For information or to subscribe to PACER (the online court-document-viewing system), you may visit the PACER Service Center website at http://pacer.psc.uscourts.gov or call (800) 676-6856. Due to the payment of certain creditors, certain court-approved agreements, and the discovery and/or investigation of other assets and liabilities, the Debtor's Schedules may be subsequently amended from time to time to reflect such information; however, any failure to amend shall not result in a claimant's Claim receiving a distribution for amounts already satisfied, released, or assigned.

Also, in conformance with the Guidelines of the Office of the United States Trustee for the Northern District of Texas, the Debtor has filed the required monthly operating reports and paid (and/or have made arrangements to pay) the quarterly United States Trustee fees. The monthly operating reports detail the Debtor's postpetition operating activities, income, and disbursements. Copies of the Debtor's monthly operating reports also may be obtained online from the Court's website at: https://ecf.txnb.uscourts.gov/cgi-bin/login.pl.

### B. Significant Orders and Events During the Debtor's Bankruptcy Case.

#### 1. General Case Background

The Debtor filed its voluntary Chapter 11 petition on November 2, 2009, the day prior to the Substitute Trustee foreclosure sale of the Property noticed by Dentwood.

#### 2. Employment of Professionals

On December 22, 2009, the Debtor obtained approval for the employment of Reed & Elmquist, P.C. as its bankruptcy counsel. On January 12, 2010, the Debtor obtained approval for the retention of Legend to act as the professional property management firm for the Debtor in the operation of the Property. On January 31, 2010, an application to retain McRoberts as the appraiser and expert witness for the Debtor was filed by the Debtor.

#### 3. Meeting of Creditors and Claims Bar Date

On December 2, 2009, the Debtor attended the United States Trustee's meeting of creditors under section 341(a) of the Bankruptcy Code. The Claims Bar Date for filing Claims against and Interests in the Debtor was March 2, 2010. Before or after confirmation, the Debtor and/or the Reorganized Debtor may file objections to Claims and Interests. Claims and Interests not filed by the applicable Claims Bar Date are forever barred and discharged.

#### 4. Cash Collateral Litigation with Dentwood.

Dentwood filed a motion to prohibit the Debtor's use of cash collateral on November 13, 2009 (Docket No. 9) (the "Dentwood Cash Collateral Motion"). As explained in the Dentwood Cash Collateral Motion, Dentwood

asserts that the Secured Lender's Interests includes an assignment of rents and a first lien interest in the Debtor's rental income, and hence a first lien interest in the Debtor's cash collateral.

The Debtor filed a response to the Dentwood Cash Collateral Motion on December 9, 2009 (Docket No. 28) and by way of counterclaim sought authority to use cash collateral. An initial hearing on the Dentwood Cash Collateral Motion was held on December 14, 2009, at which hearing the Court granted the Debtor authority to pay certain itemized operating expenses associated with the Property. Further negotiations and information exchanges occurred between the Debtor and Dentwood following the December 14, 2009 hearing. On January 12, 2009, the parties announced an agreement as to the use of cash collateral covering expenditures incurred in connection with the operation of the Property for November, 2009, December, 2009, and January, 2010. As of February 17, 2010, the parties were negotiating a cash collateral budget for the operation of the Property for the months of January, February, March, and April 2010, and a cash collateral hearing had been set for February 19, 2010. The cash collateral process with Dentwood has been elongated compared to ordinary Chapter 11 proceedings, and has increased the administrative expenses by the Debtor and hindered normal operations of the Property, due to the Dentwood repeatedly questioning and delaying the payment of *de minimis* legitimate and ordinary expenses incurred in the ordinary operation of the Property.

**5. Lift stay litigation with Dentwood.**

Dentwood filed a motion for relief from the automatic stay on November 27, 2009 (Docket No. 19) (the "Dentwood Lift Stay"). The Debtor filed a response to the Dentwood Lift Stay on December 9, 2009 (Docket No. 29). A preliminary hearing was held on the Dentwood Lift Stay on December 15, 2009, and the parties agreed to pass the preliminary hearing to a final hearing on January 13, 2010, which final hearing was rescheduled to February 18, 2010 according to a further agreement of the parties.

Dentwood's primary assertion in the Dentwood Lift Stay is that the Property is worth only $2.35 million according to an appraisal dated October 13, 2009 that was ordered by Rader Properties and prepared by Michael W. Massey (the "Massey Appraisal"). Thus, according to Dentwood, the Property is worth substantially less than the outstanding balance of the Loan. Dentwood maintains this assertion even though Dentwood paid $3.5 million to Chase to purchase the Loan on September 28, 2009, according to the applicable instruments from the sale and purchase of the Loan.

The Debtor opposed the Dentwood Lift Stay based upon, *inter alia*, the $4.825 million minimum market value of the Property according to the McRoberts Appraisal, the substantial value that may be realized from the Property due its proximity to the DART Green Line, the numerous defects and omissions in the Massey appraisal, and the Debtor's ability to service the Loan pending a sale of the Property.

**VI. ASSETS AND LIABILITIES OF THE DEBTOR**

**A. Overview of the Debtor's Assets and Liabilities.**

The Debtor has expended considerable time and effort to ensure the accuracy of the estimated information set forth below; however, no representation can be made that such information is without some level of inaccuracy. Moreover, the information set forth below is subject to the uncertainties of litigation and other factors that may not be resolved in the Debtor's favor. Therefore, no assurance can be given that the estimated Allowed Claims are exact or that the estimated recoveries will be achieved.

As of January 7, 2010, the Debtor estimates that the total realizable assets exceed $4.825 million, but some assets are subject to preexisting Liens of creditors. This is discussed in further detail within the Debtor's Schedules and Section X.A below. The Debtor's liabilities are detailed in Article VI.C. below and the Debtor's schedules and the Court's Claim register.

### B. Claims Asserted Against the Debtor.

The Claims Bar Date for this case is March 2, 2010, and therefore Claims could be filed after the date of this Disclosure Statement. According to the Claims scheduled by the Debtor and proofs of claim filed by creditors prior to February 17, 2010, the Claims filed against the Debtor exceed $4.5 million. Please see the chart below for the Debtor's chart of Claim classification.

The Claims filed against the Debtor have not necessarily become Allowed Claims. The Debtor is in the process of analyzing these Claims and may file objections to one or more of such Claims. The Debtor may file objections to claims prior to confirmation. The Plan allows the Reorganized Debtor at least three (3) months after the Effective Date to file objections to Claims. The Debtor reserves the right to object to the above and all other Claims (and Interests) filed or scheduled in the Bankruptcy Case. The Court's register for Claims filed against the Debtor is available on the Courts' website at: https://ecf.txnb.uscourts.gov/cgi-bin/login.pl. The Plan further provides that, in certain instances, the filing, litigation, settlement, or withdrawal of all objections and Estate Actions may be made by the Reorganized Debtor without approval by the Court under Bankruptcy Rule 9019.

### C. Estimated Allowed Claims and Estimated Recoveries.

The Debtor reserves all rights to object to any and all Claims, Liens, and Interests filed or asserted against the Debtor or its property or property interests notwithstanding any discussion or treatment herein. The Debtor preliminarily estimates that the aggregate Allowed Claims against the Debtor's estate will be as follows, noting however, that Subordinated Claims include Claims against which the Debtor believes it possesses substantial objections and/or are held by Insiders who will consent to such subordination and which Subordinated Claims ultimately will receive no distributions from the estate and thus will be effectively disallowed in their entirety.

| Class of Claims | Classification of Claims | Estimated Number of Claims | Estimated Allowed Amt. of Claims ($) | Estimated Recovery of Classes[2] |
|---|---|---|---|---|
| N/A | Administrative Claims | 2 | 75,000 | Unimpaired |
| N/A | Priority Tax Claims | 0 | 0 | Unimpaired |
| Class 1 | Secured Claims | | | |
| 1.1 | Allowed Secured Tax Claims | 0 | 0.00[3] | Impaired |
| 1.2 | RP Dentwood SC, L.P. | 1 | 3,531,714 | Impaired |
| Class 2 | Unsecured Priority Claims | 0 | 0 | |
| Class 3 | General Unsecured Claims | | | |
| 3.1 | General Unsecured Claims Under $1,000 | 9 | 2,267.18 | Impaired |
| 3.2 | General Unsecured Claims Over $1,000 | 10 | 34,214.22 | Impaired |
| Class 4 | Subordinated and Penalty Claims | 0 | 0 | Impaired |
| Class 5 | Interests | 28 | n/a | Impaired |
| Class 6 | Insider Unsecured Claims | 3 | 899,163.00 | |
| -- | **Totals** | **25** | **4,542,358** | |

### D. Estimated Professional Fees and Reorganization Costs.

The Debtor estimates that the aggregate requested postpetition professional fees and other reorganization costs asserted in its Bankruptcy Case, excluding ordinary course liabilities, will be approximately $75,000 on the Effective Date, assuming an Effective Date in June, 2010. Approximately $30,000.00 of this amount has been

---

[2] Assuming holders of Claims do not agree to receive alternative treatment.
[3] 2009 ad valorem property taxes were paid on or before February 1, 2010.

funded to Reed & Elmquist  by a retainer collected at the outset of the case, and approximately $12,000 has been funded to McRoberts.[4]

### E. Preference and Other Avoidance Litigation and Estate Actions.

Pursuant to the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of Insiders, the Bankruptcy Code provides for a one-year preference period.   There are certain defenses to such recoveries. Transfers made in the ordinary course of the debtor's and the transferee's businesses, according to ordinary business terms, are not recoverable.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a transfer is recovered by a debtor, the transferee has a General Unsecured Claim against the debtor to the extent of the recovery.  The Debtor reserves all rights to pursue, at its sole discretion, any Estate Actions not limited to but including any preference to the full extent allowed under the Bankruptcy Code and applicable state laws.  The Debtor may also pursue other actions including but not limited to actions under Chapter 5 of the Bankruptcy Code.  After confirmation of the Plan, the Reorganized Debtor shall be vested to bring such causes of action for the benefit of creditors of the estate.

Also, under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered it insolvent if, and to the extent, the Debtor receives less than fair value for such property.  The Debtor reserves all rights to pursue, in its sole discretion, any fraud or fraudulent transfer to the full extent allowed under the Bankruptcy Code and applicable state laws.  After confirmation of the Plan, the Reorganized Debtor shall be vested to bring such causes of action for the benefit of creditors of the estate.

The Debtor reserves all of its rights with respect to any litigation including but not limited to Estate Actions and objections to claims, however, the Debtor as of this time does not anticipate pursuing any litigation following the Effective Date, and the Debtor's performance under the Plan does not reply upon any recoveries from any potential litigation.  The Debtor has not identified the existence of any preference actions that may be brought on a cost-effective basis, and the Debtor has not identified any other potential avoidance actions to date.

## VII.  OVERVIEW OF THE PLAN

THE PLAN ANNEXED HERETO AND ENCLOSED HEREWITH IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT.  THE OVERVIEW OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN.   IN THE EVENT OF AN INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE OVERVIEW CONTAINED HEREIN, THE TERMS OF THE PLAN SHALL GOVERN.

Generally, the Plan is a Chapter 11 plan of reorganization that vests the assets of the Debtor's estate in the Reorganized Debtor.  The Reorganized Debtor will be directed to make distributions and payments required by the Plan, object to Claims against the Debtor's estate, and prosecute claims and Estate Actions against third parties as appropriate.  The Reorganized Debtor will be directed to make distributions to holders of Allowed Claims under the Plan.

On the Effective Date, all real and personal property of the Debtor's estate, including but not limited to all Estate Actions, shall vest in the Reorganized Debtor; provided that upon any subsequent conversion to a case under Chapter 7, all assets vesting in the Reorganized Debtor shall pass to the Chapter 7 trustee as property of the Chapter 7 estate subject to those Claims, liens, and encumbrances as allowed and restructured in the Plan and as specified

---

[4] The Debtor has obtained approval for the payment of Legend under 11 U.S.C. §328 and without further approval by the Court in the form of a fee application.

therein. From and after the Effective Date, the Reorganized Debtor shall be authorized to operate in the ordinary course of business, and shall be authorized to make the distributions required under, and implement the provisions of, the Plan.

The details of the Plan are set forth within the Plan annexed hereto and enclosed herewith and should be read closely. The treatment of each Class of as set forth in the Plan is restated from the Plan and described below. The Classification of each Claim is set forth above in Section VI.C of this Disclosure Statement and in Article III of the Plan.

By classifying a Claim the Debtor does not signify its agreement that the Claim should be an Allowed Claim. To the contrary, the Debtor reserves all of its objections, counterclaims, facts, issues, rights, remedies, and defenses with respect to the Claims set forth below and the holders thereof.

### Class 1 — Allowed Secured Claims.

#### Class 1.1 — Allowed Secured Tax Claims.

All Allowed Secured Tax Claims shall receive the amount of such holder's Allowed Claim with six percent (6.0%) interest per annum, payable in equal monthly installments over a period of five (5) years from the Effective Date commencing with a payment due on or before the thirtieth day (30th) following the Effective Date. Any claim that falls within Class 1.1 is impaired. *The Debtor believes that no Claims exist with respect to Class 1.1.*

#### Class 1.2 — Allowed Secured Claim of RP Dentwood SC, L.P.

Unless otherwise agreed to in writing by this class and the Debtor, the holder of an Allowed Secured Claim in Class 1.2 shall be treated as follows according to option (a) or option (b) below in the sole discretion of the Debtor.

(a) *Option (a).* (1) *Payment schedule.* Commencing with the twentieth (20th) day of the first full calendar month following the Effective Date, the Debtor shall pay to the holder of the Class 1.2 Allowed Secured Claim the interest that has accrued on the balance of the Class 1.2 Allowed Secured Claim over the prior calendar month (i.e., interest only payments), with the accrual of such interest commencing from and with the first full calendar month following the Effective Date, and not to exceed $7,985.00 per month for the first twelve (12) payments due after the Effective Date. Commencing with the thirteenth (13th) full calendar month following the Effective Date and continuing through the month of the Maturity Date, the Debtor shall pay to the holder of the Class 1.2 Allowed Secured Claim the amortizing payments that are due under the original Note according to the amortization schedule provided in the Section 1.2(d) of the original Note but calculated from the Effective Date and utilizing the Maturity Date and Interest Rate set forth herein and as further shown in Schedule IX of the Disclosure Statement.

(2) *Interest Rate.* The rate of interest at which the Class 1.2 Allowed Secured Claim has accrued and shall accrue interest is the non-default rate specified under the Note. Commencing with the 13th payment after the Effective Date, the rate of interest shall adjust every six (6) months as specified under the Note.

(3) *Maturity Date.* The Class 1.2 Allowed Secured Claim shall mature and the balance of the indebtedness due to Dentwood shall be due and payable as of the last day of the sixtieth (60th) month after the Effective Date (the "Maturity Date").

(4) _Loan modification documentation._  The Debtor and Dentwood shall execute loan and security documents that are mutually agreeable to the parties and which reflect the treatment prescribed herein.

(5) _Insurance._  Debtor shall maintain insurance on the Property to protect the interest of Dentwood.

(6) _Retention of security interests and liens._  The holder of the Class 1.2 Allowed Secured Claim prior to the Maturity Date shall retain its security interest and liens in, to, and against the Property.

(7) _No prepayment penalty._  Upon a sale of the Property or other event that would result in the payment in full of the Class 1.2 Allowed Secured Claim prior to the Maturity Date, the holder of the Class 1.2 Allowed Secured Claim shall not be entitled to any prepayment penalty.

(b) _**Option (b).**_  The Debtor shall surrender the full value of the collateral securing the Class 1.2 Allowed Secured Claim in accordance with _In re Sandy Ridge Development Corp._, 881 F.2d 1346 (5th Cir. 1989), in which case such Class 1.2 Allowed Secured Claim shall be deemed paid in full and fully satisfied.

The holder of the Class 1.2 Allowed Secured Claim shall not be entitled to (i) attorneys fees, (ii) collection costs asserted in connection with this Chapter 11 proceeding, nor (iii) any surcharges within the scope of 11 U.S.C. § 506(c).

Any Deficiency Amount related to such Claim shall be treated as a Class 3.2 General Unsecured Claim Over $1,000.  Class 1.2 is impaired.  Subject to confirmation of the Plan by the Court, the treatment provided by the Plan to Allowed Secured Claims supersedes all prior notes, agreements, and other documents of indebtedness or obligations executed by the Debtor prepetition. Payments are subject to the Reorganized Debtor's Minimum Cash Reserve Requirements.

## Class 2 — Priority Unsecured Claims.

All Allowed Priority Unsecured Claims shall receive the amount of such holder's Allowed Claim with six percent (6.0%) interest per annum, payable in equal monthly installments over a period of five (5) years from the Effective Date commencing with a payment due on or before the thirtieth (30th) day following the Effective Date. Any claim that falls within Class 2 is impaired. _The Debtor believes that no Claims exist with respect to Class 2._

## Class 3 — General Unsecured Claims.

### Class 3.1 — Allowed General Unsecured Claims Under $1,000.

All Allowed General Unsecured Claims Under $1,000.00 shall be paid in full in Cash on or before the sixtieth (60th) day following the Effective Date.  No Allowed General Unsecured Claim shall be entitled to interest, attorneys' fees, or other surcharge.  Payments are subject to the Reorganized Debtor's Minimum Cash Reserve Requirements. Class 3.1 is impaired.  No Allowed General Unsecured Claim Under $1,000 shall be entitled to interest, attorneys' fees, or other surcharge. Payments are subject to the Reorganized Debtor's Minimum Cash Reserve Requirements.

### Class 3.2 —Allowed General Unsecured Claims over $1,000.

Each Holder of an Allowed General Unsecured Claim over $1,000.00 shall receive such Holder's Pro- Rata Share of a distribution of equal to one-sixth of the total of all Allowed General Unsecured Claims over $1,000.00 commencing on or before the twentieth (20th) day of the month for the first full month following the Effective Date

and continuing thereafter for five (5) months (for a total of six months). In other words, Class 3.2 will be paid in full over six (6) months. Class 3.2 is impaired. No Allowed General Unsecured Claim shall be entitled to interest, attorneys' fees, or other surcharge. Payments are subject to the Reorganized Debtor's Minimum Cash Reserve Requirements.

**_ELECTION OPTION._ Any Holder of a Class 3.2 Allowed General Unsecured Claim may elect on the Ballot accompanying the Plan to receive treatment under Class 3.1 and payment of $1,000 total for each such Holder's Class 3.2 Allowed General Unsecured Claim in exchange for the full and complete satisfaction of the Class 3.2 Allowed General Unsecured Claim. Such election shall result automatically in a vote in favor of the Plan.**

### Class 4 – Subordinated Claims and Penalty Claims.

The holders of Subordinated Claims, Penalty Claims, and any other Claims against the Debtor not otherwise expressly provided for in this Plan shall not receive any distributions under the Plan on account of such Claims until all Allowed Class 3 Claims are paid in full without interest. As of the filing of this Disclosure Statement on February 17, 2010, the Debtor does not anticipate that any Claims shall fall into Class 4; however, the Debtor reserves all of its rights in this regard.

### Class 5 – Interests.

All holders of the Interests in the Debtor shall retain such Interests following confirmation of the Plan and following the Effective Date. Class 5 is not impaired by the Plan, and thus Class 5 is presumed to vote in favor of the Plan. The Interests of the Debtor consist of the limited partners of the Debtor.

### Class 6 – Insider Unsecured Claims.

Any General Unsecured Claims of an insider of the Debtor shall be subordinated to the Interests of the Limited Partners and shall receive no distribution under the Plan. The holders of the Class 6 claims are: Bay Equity Real Estate Acquisitions and Renovation General Contractors, Inc.

## VIII. FEASIBILITY AND RISKS

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor in interest, unless liquidation is expressly contemplated by the Plan. The Debtor's Plan underlies the projections set forth below.

**THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.**

### A. Discussion of Financial Projections.

The Debtor believes that, based upon the value of its assets and administrative expense claims, as well as the fact that the Plan's effectiveness is logistically simple, the Plan is feasible and the Reorganized Debtor will be

able to make the distributions contemplated by the Plan and will be financially secure and not need to seek further reorganization after confirmation.

### B. Risks.

The Plan is subject to a number of material risks, including those enumerated below. Prior to deciding how to vote on the Plan, each holder of an impaired Claim should carefully consider all of the information contained in this Disclosure Statement, especially the factors mentioned in the following paragraphs.

#### 1. Certain Risks of Non-Confirmation

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of the distributions to non-accepting holders of Claims and Interests will not be less than the value of the distributions that such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that these requirements will be satisfied, there can be no assurance that the Court will concur. The confirmation and consummation of the Plan also are subject to certain conditions, which are described in Articles III and VIII of this Disclosure Statement.

If the Plan were not to be confirmed and consummated, it is unclear whether a reorganization comparable to the reorganization contemplated hereby could be implemented in a timely manner and, if so, what distributions holders of Claims and Interests ultimately would receive with respect to their Claims and Interests. Moreover, if an alternative reorganization could not be implemented in a timely manner, it is possible that the Debtor would have to liquidate its assets under Chapter 7, in which case it is likely the holders of Claims and Interests would receive substantially less than they would have received pursuant to the Plan. *See* Article X of this Disclosure Statement.

#### 2. Potential Effects of a Prolonged Chapter 11 Proceeding

Prolonged Chapter 11 proceedings could have adverse effects on the Debtor, consisting primarily of the continuing accrual of Administrative Expenses relating to the continuation of bankruptcy proceedings, which expenses would primarily arise from a continuation of the elongated cash collateral process in which Dentwood has engaged throughout the course of this case.

#### 3. Risks Relating to the Projections

The management of the Debtor has prepared the projected financial information contained in this Disclosure Statement and as further set forth in Schedule VIII (the "Projections") in connection with the development of the Plan to present the projected effects of the Plan and the transactions contemplated hereby. The Projections assume that the Plan and the transactions contemplated hereby will be implemented in accordance with its terms and are based upon numerous other assumptions and estimates. The assumptions and estimates underlying the Projections are inherently uncertain and are subject to significant business, economic, legal, and competitive risks and uncertainties that could cause actual results to differ materially from those projected. Accordingly, the Projections are not necessarily indicative of the future financial condition or results of operations of the Reorganized Debtor that may vary significantly from those set forth in the Projections. Consequently, the projected financial information contained in this Disclosure Statement should not be regarded as a representation by the Debtor, the Debtor's advisors, or any other person that the Projections can or will be achieved.

#### 4. Capital Requirements and Cash Flow

The Plan is subject to market forces which impact the Property in the same manner as such forces impact any other Class C multifamily residential property. For example, changes in the Dallas-Fort Worth economy could create a temporary drop in occupancy and rental income as the Property experienced in 2009. Nonetheless, the Debtor believes that, as reorganized pursuant to the Plan, the Debtor shall accumulate sufficient cash reserves to

meet the obligations under the Plan to the extent of any reasonably foreseeable temporary decrease in occupancy and rental income that could occur in the future. Furthermore, considering the changes that are afoot surrounding the Property and in connection with the DART Green Line, the Debtor believes that over time the Property will become more and more immune from any aggregate downward shifts in the Dallas-Fort Worth economy. Nonetheless, temporary and/or isolated economic disruptions in the Dallas-Fort Worth economy will not diminish the market value of the Property nor diminish the post-confirmation adequate protection that exists in favor of Dentwood as a result of the value of the Property.

### 5. Forward-Looking Information May Prove Inaccurate

This Disclosure Statement contains various forward-looking statements and information that are based on management's beliefs as well as assumptions made by and information currently available to management. When used in this document, the words "believe," "expect," "anticipate," and similar expressions are intended to identify forward-looking statements. Such statements are subject to certain risks, uncertainties, and assumptions including those identified above. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated, or projected.

## IX. ALTERNATIVES TO PLAN

### A. Liquidation Analysis.

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met. One of these requirements is that each non-accepting holder of an Allowed Claim or Interest must receive or retain under the Plan, on account of such Claim or Interest, property as of the Effective Date of the Plan at least equal to the value such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date. The Debtor anticipates that each Class will accept the Plan; however, the Debtor provides a Liquidation Analysis in the unlikely event that such Class unanimity does not occur.

The table attached to the Disclosure Statement as "Schedule IX.A" shows the estimated recoveries of claims against the Debtor upon liquidation under Chapter 7 of the Bankruptcy Code if the Plan is not approved.

For purposes of the following discussion, it is assumed that a Chapter 7 trustee would seek to maximize the value of the Property. However, the Debtor believes that the circumstances surrounding a liquidation under Chapter 7 would inevitably lead to selling conditions that would substantially detract from the total value returned to the estate. Further, there is no assurance that a Chapter 7 trustee will promptly sell the real property and assets, which would cause a forced liquidation at even more depressed prices. The following are some, but not all, of the deleterious consequences that the Debtor believes would result from Chapter 7 liquidation:

- Substantial Chapter 7 administrative costs relating to professional fees, broker commissions, trustee payments, and other associated expenses would necessarily be incurred.
- The Chapter 7 Trustee would be forced to operate the Property and incur administrative expense in doing so.
- The sale of the Property under the time pressure and adverse publicity attendant to a Chapter 7 liquidation would create a difficult selling environment and would result in a transaction consummated at a substantial discount to full market value of the Property.
- A Chapter 7 Trustee may be unfamiliar with the Debtor's operations and/or the Property at the time of his/her appointment and is not likely to be in a position to market the Debtor's assets during the liquidation period as effectively as current management.
- The Chapter 7 Trustee's process of winding-down the Debtor's affairs, objections to Claims, and undertaking similar activities could take much longer than contemplated under the Plan.

### B. Other Alternative Plans.

The Debtor believes that to maximize the going concern value of the Estate Assets and, commensurately maximize the return to creditors, the current Plan is the most desirable and beneficial plan to pursue.

## X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to the Debtor, and to holders of Claims and Interests. This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations thereunder, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement. Changes in these rules, or new interpretations of these rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

The material U.S. federal income tax consequences of the Plan and the formation and operation of the Reorganized Debtor are complex and subject to uncertainties. Except as provided herein, the Debtor has not requested a ruling from the IRS or an opinion with respect to any of the tax aspects of the Plan. There can be no assurance that the IRS will agree with this discussion of material federal income tax consequences. In addition, this summary does not address state, local, or foreign tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations, or investors in pass-through entities).

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR CREDITOR. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES TO THEM IN CONNECTION WITH THE PLAN.**

### A. Federal Income Tax Consequences to the Debtor.

#### 1. In General

The Debtor is satisfying the principal indebtedness associated with the Property in full pursuant to the Plan. Accordingly, the Debtor does not anticipate any abnormal tax consequences arising from the execution of the Plan. The Debtor does not make any representations in this Disclosure Statement concerning the tax basis, depreciation, or other tax attributes of the Property that may have existed prior to the commencement of this case.

#### 2. Treatment of Debt Discharge Income Under the Plan

In general, section 61(a)(12) of the Tax Code provides that a taxpayer who realizes discharge of indebtedness income must include such income ("Debt Discharge Income") in taxable gross income. As a result of the Plan, the Debtor will realize a Debt Discharge if the fair market value of the property transferred by the Debtor to its Creditors for the benefit of its Creditors is less than the amount of Claims that such Creditors have against the Debtor. The Tax Code further provides in section 108(a)(1), however, that if a taxpayer is in a Title 11 case and the discharge of indebtedness is pursuant to a plan approved by a bankruptcy court, such Debt Discharge Income is not required to be included in gross income. However, section 108(b) of the Tax Code further provides that amounts so excluded from gross income will reduce certain tax attributes of the taxpayer, including NOL carryovers and the adjusted tax bases of assets.

Debt Discharge Income will arise with respect to those Claim holders whose Claims are discharged by a payment of Cash or distributions of property, with a value less than the face amount of the Allowed Claims. The Debt Discharge Income would equal the excess of the debt canceled over the Cash and fair market value of property

received in exchange therefore. Regardless of the amount of Debt Discharge Income, there will be no taxable income recognized by the Debtor.

### B. Federal Income Tax Consequences to Creditors.

The tax consequences of the implementation of the Plan to a Claim holder will depend in part on (i) whether the Claim holder's Claim constitutes a security for federal income tax purposes, (ii) whether the Claim holder reports income on the accrual basis, (iii) whether the Claim holder receives consideration in more than one tax year of the Claim holder, (iv) whether the Claim holder is a resident of the United States, and (v) whether all the consideration received by the Claim holder is deemed to be received by that Claim holder as part of an integrated transaction. The federal tax consequences upon the receipt of Cash allocable to interest are discussed in "Tax Consequences to Claim holders - Receipt of Interest," below.

A Claim holder will recognize gain or loss on the exchange of his or her existing Claim (other than a Claim for accrued interest) for any consideration. The amount of such gain or loss will equal the difference between (i) the "amount realized" in respect of such Claim and (ii) the adjusted tax basis of the Claim holder in such Claim. Pursuant to section 1001 of the Tax Code, the "amount realized" will be equal to the sum of the Cash plus the fair market value of any other property received in such exchange.

A Claim holder who receives Cash in full satisfaction of his or her Claim will be required to recognize gain or loss on the exchange. The Claim holder will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Claim holder in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth above.

In the case of a Claim holder whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss. In the case of a Claim holder whose existing Claim constitutes a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest. Any capital gain or loss recognized by a Claim holder will be long-term capital gain or loss with respect to those Claims for which the holding period of the Claim holder is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Claim holder is twelve (12) months or less.

BECAUSE THE FINAL OUTCOME DEPENDS SO MUCH ON EACH INDIVIDUAL CLAIM HOLDER'S AND INTEREST HOLDER'S SITUATION, IT IS IMPERATIVE THAT EACH CLAIM AND INTEREST HOLDER SEEK INDIVIDUAL TAX COUNSEL FOR ADVICE ON HIS OR HER PARTICULAR SITUATION.

## XI. MISCELLANEOUS PROVISIONS

As specified in section 1125(e) of the Bankruptcy Code, persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

## XII. CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtor's estate and the potential benefits that might accrue to holders of Claims against and Interests in the Debtor under the Plan as proposed. The Plan is the result of extensive efforts by the Debtor and its advisors to provide the Debtor's creditors with payment in full (with the exception of certain numerated Insiders). The Debtor believes that the Plan is feasible and will provide each holder of a Claim against the Debtor with an opportunity to receive greater benefits than those that would be received by any other alternative available to the Debtor. Therefore, the Debtor urges you to vote in favor of the Plan.

Through confirmation of the Plan, the Debtor believes that the Reorganized Debtor can resolve all Claims that have been, or could be, asserted against it in a timely and cost-effective manner. The Debtor believes that the Plan provides a mechanism to resolve and provide just compensation to all Claim holders. The Debtor believes that the Plan is fair to all parties-in-interest and should be approved by all persons entitled to vote.

Whether or not you expect to attend the Confirmation Hearing, which is scheduled for _____, **2010** at _____ __.m. Central Time, you must sign, date, and mail, hand deliver, or fax your Ballot as soon as possible for the purpose of having your vote count at such hearing. All votes must be received by the Debtor's counsel, as indicated on the Ballot, on or before _____ _m. Central Time on _____, **2010**. Any Ballot that is unsigned, illegible, or that fails to properly designate an acceptance or rejection of the Plan with an appropriate Claim amount may not be counted as a vote in favor of the Plan.

**DATED: February 17, 2010**

## TEXAS BAY PLANTATION HOUSE LIMITED PARTNERSHIP

By: Texas Bay Plantation House General Partner, L.L.C.
Its: General Partner

By: ___/s/ James Goody_____
James Goody
Its: Managing Member

**Counsel to the Debtor
and Debtor-in-Possession:**

Jeff Carruth
 Texas State Bar No. 24001846

REED & ELMQUIST, P.C.
604 Water Street
Waxahachie, TX 75165
(469) 483-0218
(972) 923-0430 (fax)
jcarruth@bcylawyers.com

## EXHIBITS TO DISCLOSURE STATEMENT

**SCHEDULE "IX"**          **Projections in support of the Plan.**

**SCHEDULE "X.A"**          **Ch. 11 v. Ch. 7 Liquidation Analysis .**

## AERIAL



| Street Address | Total SF Land | Zoning |
|---|---|---|
| 1. 5404 Denton Dr Cut Off | 35,720 SF | Limited Commercial |
| 2. 5515 Denton Dr Cut Off | 115,390 SF | General Retail |
| 3. 5520 Denton Dr Cut Off | 33,411 SF | General Retail |
| 4. 5448 Denton Dr Cut Off | 65,645 SF | General Retail |
| 2601 Hudnall | 183,605 SF | Multi-Family 2 |
| 2601 Hudnall | | Limited Commercial |

## EXHIBIT A



Home | Find Property | Contact
Us

**NAVIGATION LINKS**

- About DCAD
- Search Appraisals
  - By Owner
  - By Account
  - By Address
  - By Business
- Find Property on Map
- Online BPP Rendition
- Forms
- Data Products
- Exemptions
- Protest Process
- Paying Taxes
- Local Tax Offices
- Taxing Unit Rates
- F.A.Q.
- Calendar
- Certified Value Summaries
- Certified Comparisons
- Preliminary Value Summary
- Average House Values
- Reappraisal Plan
- Water & Electricity Usage
- Human Resources
- Links
- Contact Us
- On-line Help

# Find Property By Owner Name

**Search By:**  Owner Name   Account Number
Street Address   Business Name   Map

Enter at least the first two letters of the last name in the format
Last Name [space] First Name.

**Owner Name**

| RP DENTWOOD SC LP |   [ Search ]

**Account Type**

☐ RESIDENTIAL
☑ COMMERCIAL
☐ BPP

Hints:

- Enter only the first part of the last name.
- Names like McDonald may be spelled with a space such as Mc Donald.
- Use % as a wildcard. For example, %la in the owner name to find all owners with "La" somewhere in the name.

| < PREV   matches 1 - 4 of 4 properties.   NEXT > | | | | Page 1 of 1 |
|---|---|---|---|---|
| # | Property Address | City | Owner Name / Business Name | Total Value | Type |
| 1 | 5520 DENTON DR CUT OFF DR | DALLAS | RP DENTWOOD SC LP | $360,840 | COMMERCIAL |
| 2 | 5456 DENTON DR | DALLAS | RP DENTWOOD SC LP | $1,743,030 | COMMERCIAL |
| 3 | 5448 DENTON DR | DALLAS | RP DENTWOOD SC LP | $1,379,530 | COMMERCIAL |
| 4 | 5404 DENTON DR | DALLAS | RP DENTWOOD SC LP | $770,450 | COMMERCIAL |
| < PREV   matches 1 - 4 of 4 properties.   NEXT > | | | | Page 1 of 1 |

© 2009 Dallas Central Appraisal District.
All Rights Reserved.

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

**Property Name / Address:**      Plantation House
2601 Hudnall Street
Dallas, Texas 75235

**Dallas Mapsco:**      Page 34-U

**Date of Data Gathering:**      December 2009 and January 2010

**Effective Date of Appraisal:**      December 30, 2009

**Ownership:**      Texas Bay Plantation House Limited Partnership

**Appraisal Client:**      Texas Bay Plantation House Limited Partnership

**Problem to be Solved:**      Estimate the market value of the fee simple interest.

**Intended Use of Report:**      Litigation and expert testimony – United States Bankruptcy
Court, Northern District of Texas – Cause No. 09-37555-
HDH11.

**Intended User(s):**      Texas Bay Plantation House Limited Partnership, its attorney,
Reed & Elmquist, P.C. and Judge Harlin Hale with the United
States Bankruptcy Court, Northern District of Texas.

**Interest Appraised:**      Fee simple estate

**Site Description:**      The rectangular shaped 4.22-acre tract of land is located at
the southwest corner of Hudnall Street and Denton Drive.
The property has 710.55 lineal feet of frontage along the
northwest line of Hudnall Street and 275 lineal feet along the
southwest line of Denton Drive. Additionally, the property has
17.44 lineal feet of frontage along Denton Drive Cut-Off as
well as 445.95 lineal feet of frontage along a public alley on a
portion of the northwest property line.

Primary access to the property is provided via a curb cut
along Hudnall Street and a curb cut along Denton Drive.
Access is also available from Denton Drive Cut-Off and the
public alley. The property has good visibility from all
frontages. Additionally, the property is visible from Maple
Avenue as well as Harry Hines Boulevard south of the subject
– along the Butler Street corridor. An ingress / egress
easement crosses the southern 30 feet of the subject site as
described in the deed recorded in July 1960 in Volume 5376,
Page 537 of the Dallas County Deed Records.

Topography is level and at street grade. According to Flood
Insurance Rate Map (FIRM) number 48113C0330J (dated
August 23, 2001), no portion of the property lies within a
designated flood zone.

All utilities are available to the site. The soil is assumed of sufficient load bearing capacity, as is evidenced by the existing improvements and area development.

Schedule B of a past title policy, easements to Dallas Power & Light and Southwestern Bell are located on the property. Based on the use of the property, the easements do not appear to hinder redevelopment potential.

DART's Green Line (light rail system) is under construction along the south side of Denton Drive Cut-Off. An *elevated* stop will be located approximately a tenth of a mile west of the property.

In conclusion, the subject's size, shape, topography, and drainage are conducive to development in accordance with highest and best use – multifamily residential.

**Improvement Description:** Plantation House Apartments consist of a 124-unit multifamily residential community completed in 1961. When built the property had 125 units; however, one unit (B2) was converted to the leasing / management office. The unit mix contains 7% efficiency units, 46% one-bedroom / one-bath units, 16% two-bedroom / one-bath plans and 31% two-bedroom / two bath units. Net rentable area totals 110,988 square feet with an average unit size of 895 square feet.

The wood frame buildings are primarily covered with brick veneer, with a very limited surface area having horizontal wood siding. The pitched roofs have composition shingles, except for the roofs on the two buildings containing the one-bedroom loft units. These buildings have a flat roof with a built-up roof cover. All apartments have both front and back doors.

Interiors consist of eight-foot ceilings, carpet and VCT and / or laminate (*faux wood*) flooring. Kitchen appliances consist of an electric range / oven with vent hood, dishwasher and refrigerator. Counter surfaces are either laminate (replacement) or original 4-inch ceramic tile. Cabinetry is original. Closets are both walk-in and wall closets. No units have utility hook-ups for washer and dryers, which is typical for the age. One laundry room is located in each phase.

Parking and drives are asphalt paved. The parking area has fencing with gates; however, the gates are not operational and therefore do not control access.

Based upon the appraisers' observations, the property is in overall fair condition. None of the units were reported to be non-leasable. Several areas of wood siding were noted to have water damage and / or in need of repainting. The asphalt drives and parking areas are in fair condition.

| Plantation House | Summary of Salient Facts & Conclusions |
|---|---|

**Zoning:** Planned Development (PD) – 193 (MF-2)

**Environmental:** The Executive Summary of a Phase I Environmental Site Assessment performed by AquaTerra Assessments dated May 18, 2005, was provided. According to the AquaTerra report, there were no recognized environmental conditions.

**Highest and Best Use:** Continued use of the existing improvements (interim use) until redevelopment is financially feasible for a new mid-density multifamily community taking advantage of the proximity to DART's Inwood Rail Station.

**Exposure / Marketing Time:** 12± months

**Market Value:** $4,825,000

Five Year Cash Flow Projection
Plantation House Apartments
Dallas, Texas

**DRAFT - NO ADMISSION OF LIABILITY.  SUBJECT TO REVISION**

| | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Income** | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 |
| Rental Income | 58,500 | 59,000 | 59,500 | 60,000 | 60,500 | 61,000 | 61,500 | 62,000 | 62,500 | 63,000 | 63,500 | 64,000 |
| Other Revenue (utility income, application fees, etc.) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **Total Projected Income** | $64,500 | $65,000 | $65,500 | $66,000 | $66,500 | $67,000 | $67,500 | $68,000 | $68,500 | $69,000 | $69,500 | $70,000 |
| **Expense** | | | | | | | | | | | | |
| Management Fees | $2,258 | $2,275 | $2,293 | $2,310 | $2,328 | $2,345 | $2,363 | $2,380 | $2,398 | $2,415 | $2,433 | $2,450 |
| Administrative Expense | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 |
| Payroll Costs | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 |
| Repairs and Maintenance | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 |
| Contract Services | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 |
| Painting and Decorating | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 |
| Landscaping | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 |
| Utilities | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 |
| Building Services | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 |
| Property and Liability Insurance | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Property Taxes | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 |
| **Total Projected Operating Expense** | $41,853 | $41,870 | $41,888 | $41,905 | $41,923 | $41,940 | $41,958 | $41,975 | $41,993 | $42,010 | $42,028 | $42,045 |
| **Net Operating Income** | $22,648 | $23,130 | $23,613 | $24,095 | $24,578 | $25,060 | $25,543 | $26,025 | $26,508 | $26,990 | $27,473 | $27,955 |
| **Capital Expenditures** | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 |
| **Reorganization Expenses** | | | | | | | | | | | | |
| Class 1.1 - Allowed Secured Tax Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 1.2 - RP Dentwood SC, LP | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 |
| Class 2.0 - Unsecured Priority Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.1 - General Unsecured Claims Under $1,000 | $6,976 | $6,976 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.2 - General Unsecured Claims Over $1,000 | $3,755 | $3,755 | $3,755 | $3,755 | $3,755 | $3,755 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Reorganization Expenses** | $18,716 | $18,716 | $11,740 | $11,740 | $11,740 | $11,740 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 | $7,985 |
| **Net Cash Flow** | $1,327 | $1,810 | $9,269 | $9,751 | $10,234 | $10,716 | $14,953 | $15,436 | $15,918 | $16,401 | $16,883 | $17,366 |
| **Cash Carry Forward** | $1,327 | $3,137 | $12,406 | $22,157 | $32,390 | $43,106 | $58,059 | $73,495 | $89,414 | $105,814 | $122,698 | $140,064 |

**DRAFT - NO ADMISSION OF LIABILITY.  SUBJECT TO REVISION**

| | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Income** | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Apr-12 |
| Rental Income | 65,500 | 67,000 | 68,500 | 70,000 | 71,500 | 73,000 | 74,500 | 76,000 | 77,500 | 79,000 | 80,500 | 82,000 |
| Other Revenue (utility income, application fees, etc.) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **Total Projected Income** | $71,500 | $73,000 | $74,500 | $76,000 | $77,500 | $79,000 | $80,500 | $82,000 | $83,500 | $85,000 | $86,500 | $88,000 |
| **Expense** | | | | | | | | | | | | |
| Management Fees | $2,503 | $2,555 | $2,608 | $2,660 | $2,713 | $2,765 | $2,818 | $2,870 | $2,923 | $2,975 | $3,028 | $3,080 |
| Administrative Expense | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 |
| Payroll Costs | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 |
| Repairs and Maintenance | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 |
| Contract Services | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 |
| Painting and Decorating | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 |
| Landscaping | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 |
| Utilities | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 |
| Building Services | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 |
| Property and Liability Insurance | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Property Taxes | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 |
| **Total Projected Operating Expense** | $42,098 | $42,150 | $42,203 | $42,255 | $42,308 | $42,360 | $42,413 | $42,465 | $42,518 | $42,570 | $42,623 | $42,675 |
| **Net Operating Income** | $29,403 | $30,850 | $32,298 | $33,745 | $35,193 | $36,640 | $38,088 | $39,535 | $40,983 | $42,430 | $43,878 | $45,325 |
| **Capital Expenditures** | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 |
| **Reorganization Expenses** | | | | | | | | | | | | |
| Class 1.1 - Allowed Secured Tax Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 1.2 - RP Dentwood SC, LP | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| Class 2.0 - Unsecured Priority Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.1 - General Unsecured Claims Under $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.2 - General Unsecured Claims Over $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Reorganization Expenses** | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| **Net Cash Flow** | $10,578 | $12,026 | $13,473 | $14,921 | $16,368 | $17,816 | $19,263 | $20,711 | $22,158 | $23,606 | $25,053 | $26,501 |
| **Cash Carry Forward** | $150,642 | $162,668 | $176,141 | $191,062 | $207,430 | $225,246 | $244,509 | $265,220 | $287,379 | $310,984 | $336,038 | $362,539 |

**SCHEDULE IX**

Five Year Cash Flow Projection

Plantation House Apartments

Dallas, Texas

**DRAFT - NO ADMISSION OF LIABILITY.  SUBJECT TO REVISION**

| Income | Year 3 Month 1 May-12 | Year 3 Month 2 Jun-12 | Year 3 Month 3 Jul-12 | Year 3 Month 4 Aug-12 | Year 3 Month 5 Sep-12 | Year 3 Month 6 Oct-12 | Year 3 Month 7 Nov-12 | Year 3 Month 8 Dec-12 | Year 3 Month 9 Jan-13 | Year 3 Month 10 Feb-13 | Year 3 Month 11 Mar-13 | Year 3 Month 12 Apr-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental Income | 82,500 | 83,000 | 83,500 | 84,000 | 84,500 | 85,000 | 85,500 | 86,000 | 86,500 | 87,000 | 87,500 | 88,000 |
| Other Revenue (utility income, application fees, etc.) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **Total Projected Income** | $88,500 | $89,000 | $89,500 | $90,000 | $90,500 | $91,000 | $91,500 | $92,000 | $92,500 | $93,000 | $93,500 | $94,000 |
| **Expense** | | | | | | | | | | | | |
| Management Fees | $3,098 | $3,115 | $3,133 | $3,150 | $3,168 | $3,185 | $3,203 | $3,220 | $3,238 | $3,255 | $3,273 | $3,290 |
| Administrative Expense | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 |
| Payroll Costs | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 |
| Repairs and Maintenance | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 |
| Contract Services | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 |
| Painting and Decorating | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 |
| Landscaping | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 |
| Utilities | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 |
| Building Services | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 |
| Property and Liability Insurance | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Property Taxes | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 |
| **Total Projected Operating Expense** | $42,693 | $42,710 | $42,728 | $42,745 | $42,763 | $42,780 | $42,798 | $42,815 | $42,833 | $42,850 | $42,868 | $42,885 |
| **Net Operating Income** | $45,808 | $46,290 | $46,773 | $47,255 | $47,738 | $48,220 | $48,703 | $49,185 | $49,668 | $50,150 | $50,633 | $51,115 |
| **Capital Expenditures** | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 |
| **Reorganization Expenses** | | | | | | | | | | | | |
| Class 1.1 - Allowed Secured Tax Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 1.2 - RP Dentwood SC, LP | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| Class 2.0 - Unsecured Priority Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.1 - General Unsecured Claims Under $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.2 - General Unsecured Claims Over $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Reorganization Expenses** | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| **Net Cash Flow** | $26,983 | $27,466 | $27,948 | $28,431 | $28,913 | $29,396 | $29,878 | $30,361 | $30,843 | $31,326 | $31,808 | $32,291 |
| **Cash Carry Forward** | $389,522 | $416,988 | $444,936 | $473,367 | $502,280 | $531,676 | $561,554 | $591,915 | $622,759 | $654,084 | $685,893 | $718,184 |

SCHEDULE IX

Five Year Cash Flow Projection

Plantation House Apartments

Dallas, Texas

**DRAFT - NO ADMISSION OF LIABILITY. SUBJECT TO REVISION**

| | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 | Year 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Income** | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 |
| Rental Income | 88,500 | 89,000 | 89,500 | 90,000 | 90,500 | 91,000 | 91,500 | 92,000 | 92,500 | 93,000 | 93,500 | 94,000 |
| Other Revenue (utility income, application fees, etc.) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **Total Projected Income** | $94,500 | $95,000 | $95,500 | $96,000 | $96,500 | $97,000 | $97,500 | $98,000 | $98,500 | $99,000 | $99,500 | $100,000 |
| **Expense** | | | | | | | | | | | | |
| Management Fees | $3,308 | $3,325 | $3,343 | $3,360 | $3,378 | $3,395 | $3,413 | $3,430 | $3,448 | $3,465 | $3,483 | $3,500 |
| Administrative Expense | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 |
| Payroll Costs | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 |
| Repairs and Maintenance | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 |
| Contract Services | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 |
| Painting and Decorating | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 |
| Landscaping | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 |
| Utilities | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 |
| Building Services | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 |
| Property and Liability Insurance | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Property Taxes | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 |
| **Total Projected Operating Expense** | $42,903 | $42,920 | $42,938 | $42,955 | $42,973 | $42,990 | $43,008 | $43,025 | $43,043 | $43,060 | $43,078 | $43,095 |
| **Net Operating Income** | $51,598 | $52,080 | $52,563 | $53,045 | $53,528 | $54,010 | $54,493 | $54,975 | $55,458 | $55,940 | $56,423 | $56,905 |
| **Capital Expenditures** | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 |
| **Reorganization Expenses** | | | | | | | | | | | | |
| Class 1.1 - Allowed Secured Tax Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 1.2 - RP Dentwood SC, LP | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| Class 2.0 - Unsecured Priority Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.1 - General Unsecured Claims Under $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.2 - General Unsecured Claims Over $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Reorganization Expenses** | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| **Net Cash Flow** | $32,773 | $33,256 | $33,738 | $34,221 | $34,703 | $35,186 | $35,668 | $36,151 | $36,633 | $37,116 | $37,598 | $38,081 |
| **Cash Carry Forward** | $750,957 | $784,213 | $817,951 | $852,172 | $886,875 | $922,061 | $957,729 | $993,880 | $1,030,514 | $1,067,629 | $1,105,228 | $1,143,309 |

**Five Year Cash Flow Projection**

**Plantation House Apartments**

Dallas, Texas

**DRAFT - NO ADMISSION OF LIABILITY.  SUBJECT TO REVISION**

| | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 | Year 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Income** | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 |
| Rental Income | 94,500 | 95,000 | 95,500 | 96,000 | 96,500 | 97,000 | 97,500 | 98,000 | 98,500 | 99,000 | 99,500 | 100,000 |
| Other Revenue (utility income, application fees, etc.) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| **Total Projected Income** | $100,500 | $101,000 | $101,500 | $102,000 | $102,500 | $103,000 | $103,500 | $104,000 | $104,500 | $105,000 | $105,500 | $106,000 |
| **Expense** | | | | | | | | | | | | |
| Management Fees | $3,518 | $3,535 | $3,553 | $3,570 | $3,588 | $3,605 | $3,623 | $3,640 | $3,658 | $3,675 | $3,693 | $3,710 |
| Administrative Expense | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 | $3,458 |
| Payroll Costs | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 | $12,667 |
| Repairs and Maintenance | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 | $1,750 |
| Contract Services | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 |
| Painting and Decorating | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 | $713 |
| Landscaping | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 |
| Utilities | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 | $8,400 |
| Building Services | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 | $850 |
| Property and Liability Insurance | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Property Taxes | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 | $5,408 |
| **Total Projected Operating Expense** | $43,113 | $43,130 | $43,148 | $43,165 | $43,183 | $43,200 | $43,218 | $43,235 | $43,253 | $43,270 | $43,288 | $43,305 |
| **Net Operating Income** | $57,388 | $57,870 | $58,353 | $58,835 | $59,318 | $59,800 | $60,283 | $60,765 | $61,248 | $61,730 | $62,213 | $62,695 |
| **Capital Expenditures** | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 | $2,604 |
| **Reorganization Expenses** | | | | | | | | | | | | |
| Class 1.1 - Allowed Secured Tax Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 1.2 - RP Dentwood SC, LP | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| Class 2.0 - Unsecured Priority Claims | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.1 - General Unsecured Claims Under $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Class 3.2 - General Unsecured Claims Over $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Reorganization Expenses** | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 | $16,220 |
| **Net Cash Flow** | $38,563 | $39,046 | $39,528 | $40,011 | $40,493 | $40,976 | $41,458 | $41,941 | $42,423 | $42,906 | $43,388 | $43,871 |
| **Cash Carry Forward** | $1,181,872 | $1,220,918 | $1,260,446 | $1,300,457 | $1,340,950 | $1,381,926 | $1,423,384 | $1,465,325 | $1,507,749 | $1,550,654 | $1,594,043 | $1,637,914 |

**LIQUIDATION ANALYSIS**
Draft.  Subject to Final Revision.  Not an Admission of Liability.
Prepared February 1, 2010

| ASSETS | ESTIMATED MARKET VALUE | ESTIMATED GROSS LIQUIDATION VALUE | SECURED CLAIM | RESIDUAL VALUE / DEFICIENCY CLAIM |
|---|---|---|---|---|
| Plantation House Apartments | 4,825,000 | 3,531,714 Note 1 Note 4 | 3,531,714 Note 2 Note 3 | 0 |

| UNSECURED CLAIMS | Amount per Schedule D and/or Proof of Claim | | Distribution to Unsecured Creditors Under Liquidation |
|---|---|---|---|
| Non-Insider Unsecured Claims as of Feb. 1, 2010 | 36,481 | | 0 |
| Affiliate / Insider Unsecured Claims as of Feb. 1, 2010 | 899,163 | | 0 |
| **TOTAL** | 935,644 | | 0 |

**Note 1:**  The estimated liquidation value does not take into account broker's commissions, trustee commissions, attorneys' fees and expenses, and other possible surcharges, expenses, and deductions, all of which would substantially reduce the funds available to creditors following a liquidation of the Property.

**Note 2:**  This amount reflects the secured claim of RP Dentwood, SC, L.P. and does not include property taxes for 2010 which would attach to the property and thus reduce the value that could be realized from the Property in a liquidation scenario.

**Note 3:**  The actual principal balance of the loan is $3,531,714 based on a loan history provided by JP Morgan Chase Bank, N.A. ("Chase").  Dentwood has incorrectly asserted that the outstanding balance of the loan includes charges, reserves and fees that were never assessed by Chase.

**Note 4:**  The liquidation value assumes that Dentwood would credit bid the full amount of its debt at a substitute trustee foreclosure sale under the applicable Deed of Trust.  It is possible also that Dentwood could credit bid an amount less than the full amount of the debt.